IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 13 CR 772-19 |
| vs. | ) | Honorable Elaine E. Bucklo |
| | ) | |
| GREGORY HAWTHORNE, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM
IN SUPPORT OF HIS MOTION TO SUPPRESS**

**Table of Contents**

I. INTRODUCTION--------------------------------------------------------------- 1

II. BACKGROUND---------------------------------------------------------------- 1

    A. Search Warrant and Complaint---------------------------------------------- 1

        1. Search Warrant----------------------------------------------------- 1

        2. Complaint--------------------------------------------------------- 2

    B. Search and Seizures------------------------------------------------------ 5

III. RELEVANT LEGAL PRINCIPLES--------------------------------------------- 7

    A. Probable Cause---------------------------------------------------------- 7

        1. Overarching Principles---------------------------------------------- 7

            a. Fourth Amendment------------------------------------------- 7

            b. Constitutional Protection of the Home------------------- 7

            c. Content of the Probable-Cause Requirement---------- 8

        2. Relevant Considerations-------------------------------------------- 8

    B. Good-Faith Exception-------------------------------------------------- 10

C. Intentional or Reckless Disregard for the Truth----------------------- 10

III. APPLICATION OF THE LEGAL PRINCIPLES HERE--------------------- 11

IV. CONCLUSION----------------------------------------------------------------- 14

Exhibits

A. Search Warrant and Complaint

B. Police Report Concerning the Search and Seizures

C. Statement of Gregory Hawthorne

## I.    INTRODUCTION

In March of 2013, Gregory Hawthorne was living with his girlfriend (Tifany Thomas) and her three children (daughters Alize and Alexis Streeter [ages 14 and 6, respectively] and son Ajhanti Pass [age 12]) in an apartment on the west side of Chicago (4123 W. Potomac, 2nd Floor). Late on the night of Wednesday, March 6, 2013, Chicago police searched their apartment, seizing various items and arresting Hawthorne. For the reasons set forth below, the Court should enter an Order suppressing the evidence seized and Hawthorne's post-arrest statement, because this search was conducted in violation of Hawthorne's rights under the Fourth Amendment.

This Memorandum proceeds as follows:

(1) background (Part II);

(2) relevant legal principles (Part III);

(3) application of these principles here (Part C); and

(4) conclusion (Part D).

## II.    BACKGROUND

## A.    Search Warrant and Complaint

### 1.    *Search Warrant*

On March 5, 2013, a Chicago police officer obtained a search warrant for Hawthorne and his apartment, which stated in part as follows:

(1) "On this day, P.O. Varchetto #9301, Chicago

Police Department, and John Doe, Complainants have

subscribed and sworn to a complaint for search warrant

1

before me. Upon examination of the complaint, I find
that it states facts sufficient to show probable cause."
Ex. A (search warrant and complaint) at 1.

(2) The following items were listed for seizure:
"[a]pproximately 10 firearms including semi automatic
pistols, revolvers, and long guns, ammunition, and any
documents showing proof of residence," which "have
been used in the commission of, or which constitute
evidence of the offense of: Unlawful Use of Weapon by
Felon 720 ILC 5/24-1.1(a)." Ex. A at 1.

### 2. *Complaint*

The complaint submitted in support of the officer's request for a warrant
stated in part as follows:

(1) The complainants were identified as "P.O.
Varchetto #9031, Chicago Police Department, 025th District
Tact team and John Doe." Ex. A at 2.

(2) Permission was sought to search Hawthorne's
apartment and seize "[a]pproximately 10 firearms
including semi automatic pistols, revolvers, and long
guns, ammunition, and any documents showing proof of
residence," which "have been used in the commission of,
or which constitute evidence of the offense of: Unlawful
Use of Weapon by Felon 720 ILC 5/24-1.1(a)." Ex. A at 2.

2

(3) Background information concerning the officer was included: "I have been a Chicago Police Officer for 12 and a half years an [*sic*] am currently assigned to the 025th district tactical team. During my time as a Chicago Police Officer, I have made hundreds of weapons violation arrests and have personally prepared and executed over 75 search warrants." Ex. A at 2.

(4) The officer's interactions with an informant identified as "John Doe" were described: "On 05Mar13, I had occasion to speak with an individual who will now be known as John Doe. John Doe related to me that John Doe was inside the 2nd floor apartment located at 4123 W. Potomac within the last 48 hours where John Doe observed a large duffle bag that contained approximately 10 firearms. John Doe further related that while inside the unit, an unknown male black entered the apartment and spoke with Gregory Hawthorne about purchasing a firearm at which time Gregory Hawthorne opened the black duffel bag and showed several firearms to the male black who was inquiring to purchase a gun from Gregory Hawthorne. John Doe observed approximately 10 firearms in total

3

including semi automation [*sic*] pistols, revolvers, and long guns that were partially exposed hanging out of the duffel bag that was on the floor in the living room. John Doe did not observe the unknown male black purchase a firearm from Gregory Hawthorne while John Doe was inside the 2nd floor apartment at 4123 W. Potomac, but did observe the unknown male black leave and all of the firearms were still inside the large black duffel bag on the floor of the living room when John Doe left."

"I, P.O. Varchetto, with use of the CLEAR system produced a photo of Gregory Hawthorne IR#1311314 to John Doe at which time John Doe positively identified Gregory Hawthorne. I, P.O. Vachetto drove John Doe past . . . the address of 4123 W. Potomac where John Doe pointed out the 2nd floor (top floor) as the residence of Gregory Hawthorne. John doe [*sic*] further related that 4123 W. Potomac is an illegal conversion of a single family house and that Gregory Hawthorne resides on the 2nd floor with his girlfriend. A criminal history was obtained of Gregory Hawthorne which revealed Gregory Hawthorne to be a convicted felon for PCS under 08CR0387802. Based on the information gathered

from John Doe and my experience as a Chicago Police Officer, I believe that probable cause does exist to search Gregory Hawthorne and his residence located at 4123 W. Potomac 2nd floor, Chicago, IL. COUNTY of COOK." Ex. A at 2-3.

(5) The informant was said to be available for questioning: "John Doe now appears before the undersigned judge and is available for questioning. John Doe's criminal history, including possible pending investigations, if any, have been presented and made available to the undersigned judge." Ex. A at 3.

## 2.    Search and Seizures

Late the following night, March 6, 2013, Chicago police officers searched the apartment where Gregory Hawthorne was living with his girlfriend and her children:

(1) Over two dozen police officers participated in the search: "THE TACTICAL TEAM EXECUTED SEARCH WARRANT #13SW5029 ALONG WITH THE ASSISTANCE OF SWAT TEAM 4660." Ex. B (police report regarding the search) at 4.

(2) The police did not find a "black duffel bag" "on the floor in the living room"—or anywhere else. Ex. A at 2-3; Ex. 4. Nor did they find the items listed in the

5

warrant and the complaint: "[a]pproximately 10 firearms including semi automatic pistols, revolvers, and long guns, ammunition." Ex. A at 1-2. Instead, they found and seized the following:

(a) one pistol in "THE BEDROOM OF GREGORY HAWTHORNE (OFFENDER) . . . LOADED WITH 11 LIVE 40 CAL ROUNDS," as well as two boxes of ammunition and "PROOF OF RESIDENCY," Ex. B at 4;

(b) "IN PLAIN VIEW ON THE LIVING ROOM FLOOR NEXT TO GREGORY HAWTHORNE (OFFENDER) . . . A TOTOAL [*SIC*] OF (60) LOOSE ZIP LOCK BAGS EACH CONTAINING A CRUSHED GREEN PLANT SUSPECT CANNABIS," as well as "9 ZIP LOCK BAGS CONTAINING SUSPECT CANNABIS" from "THE HALLWAY CLOSET," Ex. B at 4;

(c) on a "KITCHEN PANTRY SHELF . . . A TOTOAL OF (210) TIN FOIL PACKETS AFFIXED TO TAPE EACH CONTAINING A WHITE POWDER SUSPECT HEROIN," Ex. B at 4; and

(d) "A TOTAL OF $4030.00 USC." Ex. B at 4.

3. After his arrest, Hawthorne allegedly told the officers at the station: "I BOUGHT THE GUN FROM MY GUY BECAUSE IVE [*SIC*] BEEN INTO IT WITH SOME FOUR CORNER HUSTLERS." Ex. B at 4.

## II.  RELEVANT LEGAL PRINCIPLES

## A.  Probable Cause

### 1.  *Overarching Principles*

*a.  Fourth Amendment*

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

*b.  Constitutional Protection of the Home*

"[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payne v. New York*, 445 U.S. 573, 585 (1980) (internal quotation marks and citation omitted). *See also, e.g.*, *United States v. Martinez-Fuerte*, 428 U.S. 543, 561 (1976) ("sanctity of private

dwellings . . . [is] ordinarily afforded the most stringent Fourth Amendment protection").[1]

c.      *Content of the Probable-Cause Requirement*

The basic question raised by the probable-cause requirement is this: "whether there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

**2.      Relevant Considerations**

Where, as here, a warrant request is based on information derived from an informant, the "informant's veracity, reliability, and basis of knowledge are all highly relevant in determining the value of his report." *Gates*, 462 U.S. at 230 (internal quotation marks omitted). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular

---

[1] *See also Stanford v. Texas*, 379 U.S. 476, 481-82 (1965) (quoting *Boyd v. United States,* 116 U.S. 616, 625 (1886)):

> Vivid in the memory of the newly independent Americans were those general warrants known as writs of assistance under which officers of the Crown had so bedeviled the colonists.  The hated writs of assistance had given customs officials blanket authority to search where they pleased for goods imported in violation of British tax laws.  They were denounced by James Otis as "'the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that ever was found in an English law book,'" because they placed "'the liberty of every man in the hands of every petty officer.'"  The historic occasion of that denunciation, in 1761 at Boston, has been characterized as "perhaps the most prominent event which inaugurated the resistance of the colonies to the oppressions of the mother country.  'Then and there,' said John Adams, 'then and there was the first scene of the first act of opposition to the arbitrary claims of Great Britain.  Then and there the child Independence was born.'"

factual contexts—not readily, or even usefully, reduced to a neat set of legal rules. . . . Informants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability." *Gates*, 462 U.S. at 232 (internal quotation marks and citation omitted).

Among the multitude of factors that may be relevant in this context are the following:

> (1) "the informant's credibility or potential bias," *United States v. Glover*, 755 F.3d 811, 816 (7th Cir. 2014), *see also, e.g., id.* at 816 ("failure to establish the informant's reliability raise[s] the concern that the tip was provided to harass or remove a rival");

> (2) the informant's prior record of providing information and the extent to which that information proved to be reliable, *see, e.g., Glover*, 755 F.3d at 817 (citing *United States v. Searcy*, 664 F.3d 119, 1123 (7th Cir. 2011), where "probable cause [was found] despite limited detail where the affidavit showed that the informant had provided reliable information before, which also suggested the report was not motivated by animus against the defendant");

> (3) "the level of detail, the extent of firsthand observation, the degree of corroboration, the time between the events reported and the warrant application, and whether the informant appeared or testified before the magistrate," *Glover*, 755 F.3d at 816 (citation omitted).

Ultimately, the probable-cause assessment depends on no single factor, or any particular combination of factors, but rather on the "totality of the circumstances." *Gates*, 462 U.S. at 240 (hyphens omitted). "Cases that test the sufficiency of affidavits for warrants obtained based on informants are highly fact-specific." *Glover*, 755 F.3d at 816.

**B.     Good-Faith Exception**

The Seventh Circuit recently addressed the good-faith exception:

> The good faith exception prevents operation of the exclusionary rule if the police officer's reliance on a search warrant was objectively reasonable. When an officer acts within the scope of a search warrant, penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations. *Leon* [*United States v. Leon*, 468 U.S. 897 (1984)] identified four situations in which the good faith exception does not apply: when the affiant misleads the magistrate with a reckless or knowing disregard for the truth, when the magistrate wholly abandons the judicial role, when the affidavit is bare bones or so lacking in indicia of probable cause that reliance is unreasonable, and when the warrant is facially deficient in that it fails to specify the place to search or the items to seize.

*Glover*, 755 F.3d at 818-19 (internal quotation marks and citations omitted).

**C.     Intentional or Reckless Disregard for the Truth**

A police officer's reliance on a facially adequate search warrant, or on a warrant whose defects would otherwise survive good-faith analysis, may still result in suppression if the officer, in obtaining the warrant, "acted with [intentional or] reckless disregard for the truth." *Glover*, 755 F.3d at 820. *See Franks v. Delaware*, 438 U.S. 154 (1978).

10

## III.    APPLICATION OF THE LEGAL PRINCIPLES HERE

1. Under the "specific" "fact[s]" of this case, *Glover*, 755 F.3d at 816, employment of the fictitious name "John Doe" was a dead giveaway that the informant's story was probably false—as, indeed, it proved to be. The "reason for using a fictitious name" in a complaint for a search warrant is "obvious": "to protect an informant-affiant from reprisal." *People v. O'Neal*, 40 Ill. App. 3d 448, 450, 353 N.E.2d 282, 284 (1st Dist. 1976). Here, however, the employment of a fictitious name would have served this function under just one set of circumstances: if the story told by the informant was false. That is because, under these particular circumstances, if the informant's story had been true, Hawthorne could readily have identified him whether or not his true name appeared in the complaint. Consider the informant's story:

> . . . John Doe was inside the 2nd floor apartment located at 4123 W. Potomac within the last 48 hours [prior to March 5, 2013] where John Doe observed a large duffle bag that contained approximately 10 firearms. . . . while inside the unit, an unknown male black entered the apartment and spoke with Gregory Hawthorne about purchasing a firearm at which time Gregory Hawthorne opened the black duffel bag and showed several firearms to the male black who was inquiring to purchase a gun from Gregory Hawthorne. . . . [John Doe] observed approximately 10 firearms in total including semi automation [*sic*] pistols, revolvers, and long guns that were partially exposed hanging out of the duffel bag that was on the floor in the living room. . . . [John Doe] did not observe the unknown male black purchase a firearm from Gregory Hawthorne while John Doe was inside the 2nd floor apartment at 4123 W. Potomac, but did observe the unknown male black leave and all of the firearms were still inside the large black duffel bag on the floor of the living room when John Doe left.

Ex. A at 2-3. If the informant's tale had been true, how many different people could have told it?

Under these particular circumstances, the link between employment of a fictitious name and the probable falsity of the informant's story affects the Fourth Amendment analysis in multiple ways. For one thing, this link demonstrates that, at a minimum, this officer "acted with reckless disregard for the truth." *Glover*, 755 F.3d at 820. Moreover, this link pointed away from probable cause, particularly in light of the issuing judge's apparent failure to question the officer or "John Doe" on this issue. *See Glover*, 755 F.3d at 817 ("[w]ithout any record we must assume that Doe did not testify").

2. Even before the search confirmed the falsity of the informant's story, its probable falsity would also have been apparent from its inherent implausibility. Consider, again, the story told by "John Doe." He claimed that he was in Hawthorne's living room for a conversation in which "an unknown male black" "was inquiring to purchase a gun from Gregory Hawthorne" and Hawthorne, in response, "opened" a "black duffel bag" and "showed [him] several firearms." Ex. A at 2. How likely is it that a would-be gun buyer would have engaged in such a conversation in front of a total stranger?

3. That the police, at a minimum, "acted with reckless disregard for the truth" is also evident from their conduct. *Glover*, 755 F.3d at 820. Their disbelief in the informant's story is evident from, among other things, their behavior at the police station following Hawthorne's arrest. Surely if the police had credited the informant's story, they would have questioned Hawthorne about his supposed

12

cache of weapons when he told them the loaded pistol found in his bedroom had been purchased from his "GUY." Ex. B at 4. The police report reflects, by omission, that no such questioning took place. *See id.*

4. Consider, too, the meagerness of the detail in the informant's story. Why was he inside Hawthorne's apartment that day? What was his relationship with Hawthorne? On these and a multitude of other relevant questions, the complaint was silent.

5. Consider also what the officer failed to say about the informant. On how many, if any, prior occasions had this individual provided information? If there were any such occasions, was the information provided shown to be reliable? What were the circumstances under which the officer happened to be talking to the informant that day? The complaint's silence on these and other related matters speaks volumes.

6. Consider, too, the officer's limited efforts to corroborate the informant's story. That story, if true, could readily have been corroborated by, for example, a controlled buy of a firearm from Hawthorne. Under the circumstances, the officer's failure to confirm the informant's claim—that Hawthorne was in possession of a large assortment of firearms—in this or any other fashion demonstrates, at a minimum, a "reckless disregard of the truth." *Glover*, 755 F.3d at 820. As the case law teaches, the corroboration the officer did obtain from the informant—that he could identify Hawthorne when shown a photograph of him and could point out his apartment when driven

13

by it—was relatively insignificant. *See, e.g., United States v. Robinson,* 724 F.3d 878, 884-885 (7th Cir. 2013) (such corroboration of "minimal utility").

D.    **CONCLUSION**

This search failed to satisfy the requirements of the Fourth Amendment. For one thing, the complaint submitted in support of the warrant request failed to establish probable cause. Even before the search confirmed the falsity of the informant's story, its probable falsity would have been apparent from both (1) its inherent implausibility, and (2) the use of a fictitious name under circumstances where the only conceivable utility of that procedure would have been to conceal the identity of a false accuser. Moreover, at a minimum, the police "acted with reckless disregard for the truth." *Glover*, 755 F.3d at 820. Permitting the government to rely upon evidence obtained in this fashion would serve to reduce the Fourth Amendment's powerful language to an empty promise.

Respectfully submitted,

s/Richard H. McLeese
Lawyer for Gregory Hawthorne

Richard H. McLeese
53 W. Jackson Blvd., Suite 1615
Chicago, IL 60604
312.492.7273
312.268.6291 (fax)
rmcleeselaw@aol.com

## **CERTIFICATE OF SERVICE**

The undersigned lawyer hereby certifies that service of the above document was made through the district court's ECF system to opposing counsel on September 10, 2014.

s/Richard H. McLeese
Lawyer for Gregory Hawthorne